## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| THOMAS COX,<br><br>              Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>              Defendant. | CASE NO. 1:21-cv-01250<br><br>DISTRICT JUDGE PATRICIA A. GAUGHAN<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Thomas Cox ("Plaintiff" or "Mr. Cox") seeks judicial review of the final
decision of Defendant Commissioner of Social Security ("Commissioner") denying his
applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).
(ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been
referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to
Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**
the Commissioner's decision.

### I.      Procedural History

Mr. Cox filed his applications for DIB and SSI on March 18, 2019.  (Tr. 262, 272, 282,
388-94, 395-401.)  He alleged a disability onset date of September 6, 2011 due to a stutter,
anxiety, and depression.  (Tr. 262, 311, 323, 388, 414.)  His applications were denied at the
initial level (Tr. 311-16) and upon reconsideration (Tr. 323-34).  On October 9, 2019, Mr. Cox

1

requested a hearing.  (Tr. 335-36.)  A hearing was held before an Administrative Law Judge ("ALJ") on May 15, 2020.  (Tr. 49-79.)

On June 2, 2020, the ALJ issued an unfavorable decision finding that Mr. Cox had not been under a disability within the meaning of the Social Security Act from September 6, 2021, through the date of the decision.  (Tr. 31-48.)  On July 21, 2020, he requested review of the ALJ's decision by the Appeals Council ("AC").  (Tr. 382-87.)  On February 25, 2021, the AC granted Mr. Cox's request for review, and issued a Notice of Appeals Council Action, informing Mr. Cox that it planned to issue a decision finding him not disabled from September 6, 2011, his alleged onset date through June 2, 2020, the date of the ALJ's decision.  (Tr. 10-14.)

Thereafter, on April 29, 2021, the AC issued its Notice of Appeals Council Decision Unfavorable.  (Tr. 1-9.)  In that decision, the AC acknowledged that the ALJ had failed to address an opinion that was contained in the record prior to the ALJ's decision.  (*Id*.)  Upon review of the record as a whole, the AC nevertheless adopted the ALJ's findings and conclusions that Mr. Cox was not disabled.  (*Id*.)  The AC explained:

> The Appeals Council adopts the Administrative Law Judge's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable.
>
> The Appeals Council adopts the Administrative Law Judge's findings or conclusions regarding whether the claimant is disabled.
>
> The regulations provide for a sequential evaluation process in determining whether a claimant is disabled (20 CFR 404.1520 and 416.920). The Appeals Council agrees with the Administrative Law Judge's findings under steps 1, 2, 3, 4 and 5 of the sequential evaluation; namely, that the claimant had not engaged in substantial gainful activity since the alleged onset date of September 6, 2011; that the claimant had severe impairments of depression, anxiety, and speech impairment; that the claimants impairments did not meet or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1; and that the claimant retained the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations, the claimant was limited to

performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work), limited to simple work related decisions in using his judgment and dealing with changes in the work setting. and able to occasionally interact with supervisors and coworkers, but never interact with the public; that the claimant was unable to perform past relevant work; but that were jobs that existed in significant numbers in the national economy that the claimant could perform.

However, the Administrative Law Judge did not address or assess the opinion Cynthia Lemke LPCC-S, NCC on May 26, 2020. The opinion was added to the record before the date of the Administrative Law Judge decision but was not added to the List of Exhibits. It was located in the E section of the electronic folder. The representative submitted the opinion so it was not proffered to the claimant, The source opined the claimant was not able to understand and remember short and detailed instructions, maintain concertation and persistence, interact with others, or adapt in the workplace on a regular, reliable, sustained basis. Additionally, the source indicated the claimant would be off task over 20% of the workday and would need breaks more than four times a day. The Appeals Council finds the opinion less persuasive. The opinion is consistent with the opinions from Tim Hicks, LPPC in Exhibits 9F and 10F, which the Administrative Law Judge considered and noted were based on the claimants subjective complaints and thus weren't persuasive. The treatment notes from Ms. Lemke show the claimant was experiencing anxiety, but they do not appear to show the extreme limitations that are discussed in the opinion provided (Exhibits 2F, 7F). Specifically, the mental status examination findings consistently found the claimant alert, with good eye contact, cooperative behavior, and linear and goal directed though process (Exhibit 2F pages 12, 14, 16; Exhibit 7F page 7). Additionally, the residual functional capacity and paragph [sic] B findings in the decision are supported by the state agency Medical consultants at both the initial and reconsideration levels as addressed by the Administrative Law Judge in the decision (Exhibits 1A, 5A). The opinion was added to the List of Exhibits as Exhibit 11F.[1]

As such, the evidence provides no basis to change the Administrative Law Judge's decision. Therefore, the Appeals Council adopts the Administrative Law Judge's findings and conclusions regarding whether claimant is disabled.

In addition, we affirm all of the findings of the Administrative Law Judge's decision from the date of the claimant's alleged onset date through the date of the decision, since there were jobs that existed in significant numbers in the national economy that the claimant could perform. Therefore, the claimant was not disabled under the framework of Medical-Vocational Rule 204.00.

(Tr. 4-6 (emphasis added).)

---

[1] The transcript does not include an Exhibit 11F.  (ECF Doc. 7.)  However, Plaintiff attached to his Brief a copy of Cynthia Lemke's May 26, 2020 opinion.  (ECF Doc. 8-1.)

The AC's April 29, 2021, decision is the final decision of the Commissioner for purposes of this Court's review.  *See Sims v. Apfel*, 530 U.S. 103, 106–07, 120 S. Ct. 2080, 2083, 147 L. Ed. 2d 80 (2000) ("[I]f the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision."); *see also* 20 C.F.R. § 404.981.  Because the Appeals Council's decision incorporates portions of the ALJ's findings and conclusions, both decisions are referenced in the discussion and analysis that follows.  *See, e.g., Frazee v. Astrue*, No. CIV. 06-14779, 2008 WL 686251, at *9 (E.D. Mich. Mar. 13, 2008).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. Cox was born in 1967 and 44 years old as of the alleged onset.  (Tr. 6, 388.)  He completed the twelfth grade but did not graduate.  (Tr. 6, 60, 415.)  He worked at gas stations in the past waiting on customers, pumping gas, stocking shelves and coolers, and counting a cash register drawer at the end of a shift.  (Tr. 60-61, 415.)

### B.     Medical Evidence

#### 1.     Treatment History

Mr. Cox reported that he had a speech problem and stuttered during school.  (Tr. 424.)  The stuttering continued through his work years, which he said resulted in bullying, caused him anxiety, depression, and fear of working.  (Tr. 424.)

Mr. Cox received his primary medical care treatment from Edward Carrillo, M.D. since 1987.  (Tr. 530, *see also* Tr. 522-29, 533-37.)  He received mental health treatment through Community Counseling Center of Ashtabula ("CCCA") from at least January 2018 through March 2020. (Tr. 474-515, 553-606.)  He generally attended counseling sessions two to three

times per month and pharmacologic appointments every other month, with some cancellations and no shows.  (Tr. 474-77, 499, 554-56, 598.)

Mr. Cox saw Premal Patwa, M.D. for pharmacological appointments at CCCA.  (Tr. 478-94, 510-15, 559-60, 577-78, 591-92.)  During a January 23, 2018 pharmacologic management telemedicine visit, Mr. Cox reported feeling down and isolated, and felt his speech problem had worsened.  (Tr. 478.)  He was attending counseling, taking Prozac, and taking Trazodone as needed for sleep.  (*Id*.)  On mental status examination, he stuttered but his speech was also clear at times.  (*Id*.)  His eye contact was good, his tone and volume of speech were normal, he was cooperative, his fund of knowledge was good, and his thought processes were linear and goal directed.  (*Id*.)  His mood and affect were down, but his affect had a normal range and intensity.  (*Id*.)  He denied suicidal or homicidal thoughts.  (*Id*.)  He was diagnosed with generalized anxiety disorder, unspecified depressive disorder, and stuttering.  (Tr. 479.)  Dr. Patwa continued Mr. Cox on his medications and recommended that he continue with counseling.  (*Id*.)

During subsequent visits with Dr. Patwa from 2018 through 2020, Mr. Cox's mental status examination findings were generally the same, except that his mood and affect fluctuated from fine or fair to mildly anxious to anxious.  (Tr. 481, 483, 485, 487, 489, 491, 493, 512, 514, 559, 577, 591.)  He reported isolating behavior, familial stressors, anxiety, sadness, and feeling down after losing his mother in early 2019.  (Tr. 485, 487, 493, 512, 514, 559, 577, 591.)  Nevertheless, he continued to have contact with his family and reported that he was coping appropriately with his mother's death.  (*Id*.)  Although there were some reported changes in symptoms and some fluctuations in mood and affect on examination, Mr. Cox's diagnoses and medications remained unchanged.  (Tr. 482, 483-84, 488, 490, 492, 494, 513, 515, 559-60, 577-78, 591-92.)

Mr. Cox also saw Professional Clinical Counselors Cynthia Lemke, LPPC-S, NCC ("LPPC Lemke") and Timothy Hicks, LPPC ("LPPC Hicks") for counseling sessions at CCCA. (Tr. 500-09, 557-58, 561-76, 579-90, 593-96, 599-606.)  When Mr. Cox saw LPPC Lemke on April 29, 2019, he reported that he was continuing to struggle with the death of his mother and was experiencing some familial stressors, including disagreement over the handling of his mother's estate.  (Tr. 500-01.)  During subsequent counseling sessions with LPPC Lemke in 2019, he reported anxiety and stress related to his stuttering, familial problems, and loss of his mother, but indicated that he continued to visit and interact with his family.  (Tr. 503, 505, 507, 570, 574, 582, 588, 593, 595.)  He reported "obsessing about never being able to work again due to his severe anxiety related to his stuttering."  (Tr. 505.)  He reported altering his life at times to avoid having to talk to others "due to multiple traumas related to his speech problems."  (Tr. 507.)  For instance, he reported pulling away from a drive-thru without completing his order and avoiding answering the phone when a friend called.  (Tr. 507, 508.)

During a session with LPPC Lemke on August 22, 2019, Mr. Cox expressed interest in consulting with an EDMR therapist.  (Tr. 595.)  He then met with LPPC Hicks on September 25, 2019 to assess whether EDMR therapy was appropriate.  (Tr. 589.)  During the visit, he reported a history of bullying related to his stuttering, and said he no longer worked due to bullying.  (Tr. 590.)  He reported that he continued to struggle over losing his mother.  (*Id*.)  He stated he would think about EDMR therapy.  (Tr. 590.)

He returned to LPPC Hicks on October 10, 2019.  (Tr. 583-84.)  At that visit, LPCC Hicks observed that Mr. Cox had the ability to manage negative feelings, had social support through his family, and was not a risk to himself or others.  (Tr. 584.)  Mr. Cox continued seeing LPPC Hicks for EDMR therapy in 2019 and 2020, where he expressed frustration and anxiety

regarding his speech impairment, and complained of intrusive thinking due in part to avoidance of emotions, hopelessness about changing, and difficulty with social situations or simple tasks such as ordering out.  (Tr. 561-62, 567-68, 571-72, 575-76, 579-80, 599-600, 603-04.)  He was noted to be stable or making some progress.  (*Id.*)

During counseling sessions with LPPC Lemke in January 2020, Mr. Cox reported that he was glad the holidays were over because it was his first Christmas without his mother.  (Tr. 566.) He also reported some self-esteem issues.  (Tr. 564.)  He was grateful for his brother's generosity and was planning on taking a friend to lunch at a local restaurant.  (*Id.*)  He reported to LPPC Lemke in February 2020 that he was isolating more because it was the only relief he had from his stuttering.  (Tr. 558.)  He reported that his self-esteem was at its low point and he was isolating in his room.  (*Id.*)  He only came out to eat, attend appointments, or pick up his great niece.  (*Id.*)  He reported being very anxious about going before the judge for his disability hearing, explaining that he was afraid for the judge to see him with "the problem" and was afraid the judge would laugh at him.  (Tr. 606.)  The following month, he reported to LPPC Lemke that he took his niece to a dance and felt good that his niece's parents were helping with the event, but also expressed worry over his upcoming hearing.  (Tr. 602.)  He also reported that his brother requested that he obtain a copy of their mother's deed from the courthouse.  (*Id.*)

2.  **Opinion Evidence**

i.  **Treating Source**

*Edward Carrillo, M.D.*

On August 14, 2019, Dr. Carrillo completed a questionnaire, stating that he first saw Mr. Cox in March 1987 and last saw him in August 2019.  (Tr. 529-31.)  Mr. Cox's diagnoses included: depression and anxiety with speech impairment, hypertension, hyperlipidemia, and

diabetes.  (Tr. 530.)  Dr. Carrillo stated that Mr. Cox had stuttered since childhood.  (*Id.*)  He reported that Mr. Cox had an adequate response to therapy, which included use of Prozac for his depression and anxiety.  (Tr. 531.)  When asked about any limitations Mr. Cox's impairment imposed on his ability to perform sustained work activity, Dr. Carrillo stated Mr. Cox was "unable to work."  (*Id.*)

On August 14, 2019, Dr. Carrillo also completed a Medical Source Assessment (Mental). (Tr. 538-40.)  He opined that Mr. Cox was limited but not completely unable to perform certain mental activities, but was unable to perform a number of mental activities on a regular, reliable, and sustained schedule, including: maintaining attention and concentration for extended periods of time; performing activities within a schedule and maintaining regular attendance or be punctual; working in coordination with or proximity to others without being distracted by them; completing a normal workday/workweek without interruptions and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (Tr. 538-39.)  Dr. Carrillo also opined that Mr. Cox would be absent more than four days per month, would need to take more than four unscheduled breaks per day, and would be off task more than 20% of time.  (Tr. 539.)  Dr. Carrillo pointed to Mr. Cox's chronic depression, anxiety, and his speech impairment as support for his opinions.  (Tr. 540.)

*Timothy Hicks, LPPC*

On April 8, 2020, LPPC Hicks completed a Medical Source Assessment (Mental).  (Tr. 607-09.)  He opined that Mr. Cox was able to perform all mental activities, but with varying

degrees of limitations.  (Tr. 607-08.)  He opined that Mr. Cox would have noticeable difficulty or distraction from job activity more than 20% of the workday or workweek, which was found in the following activities: completing a normal workday and workweek without interruptions and performing at a consistent pace without an unreasonable number and length of rest periods; interacting with the general public; asking simple questions or requesting assistance; and responding appropriately to changes in the work setting.  (*Id*.)  LPPC Hicks opined that Mr. Cox's impairments would not cause him to be absent from work or result in the need for unscheduled breaks, but would cause him to be off task 15% of the workday.  (Tr. 608.)  As support for his opinions, LPPC Hicks explained in narrative form that:

> Mr. Cox struggles with stuttering for which he has reported an extensive history of bull[y]ing by peers and coworkers - the subsequent anxiety leads to emotional and mental paralysis.  He becomes overwhelmed, per his report, with anxious thoughts that he can't stay focused.  The anxiety leads to avoidance with social situations with coworkers; resulting in him not requesting help when needed.

(Tr. 609.)  LPPC Hicks also explained that "Mr. Cox reported due to his anxiety he has left multiple jobs."  (*Id*.)

On May 14, 2020, LPPC Hicks completed another Medical Source Assessment (Mental). (Tr. 610-12.)  LPPC Hicks's opinions were generally similar to those in the April 2020 Assessment, except he opined that Mr. Cox would likely miss more than four days of work per month.  (Tr. 611.)  LPPC Hicks also opined that Mr. Cox would need about two unscheduled breaks during the workday, but he was uncertain as to how long the breaks would last, noting "Mr. Cox is observed to struggle with decreasing anxiety at end of sessions."  (*Id*.)  As support for his opinions, LPPC Hicks explained in narrative form that:

> Mr. Cox struggles with stuttering for which he reported an extensive history of bullying by peers and coworkers.  Subsequently he experiences anxiety in social situations that leads to him freezing physically and mentally per his report.  He stated he becomes overwhelmed with anxious thoughts that interferes with his

> ability to concentrate.  The anxiety leads to avoidance of social situations with other
> people beyond immediate family.  This avoidance interferes with work in several
> ways.  Mr. Cox is reluctant to ask for help when needed.  When bullied about his
> stuttering Mr. Cox's history demonstrates he decompensates as evidenced by his
> anxiety symptoms and he leaves the employment.

(Tr. 612.)  LPPC Hicks added that a review of Mr. Cox's records reflected that he had not

worked recently "as he fears being bullied for his stuttering, which triggers acute anxiety."  (*Id*.)

### Cynthia Lemke, LPCC-S, NCC

On May 26, 2020, LPCC Lemke completed a Medical Source Assessment (Mental).

(ECF Doc. 8-1.)  LPPC Lemke opined that Mr. Cox could sustain an ordinary routine without

special supervision, make simple work-related decisions, and set realistic goals or make plans

independently with noticeable difficulty or distraction from those job activities 10-20% of the

workday or workweek.  (*Id*. at pp. 2-3.)  In all other areas, LPPC Lemke opined that Mr. Cox

was unable to perform the designated tasks or function on a regular, reliable, and sustained

schedule.  (*Id*.)  LPPC Lemke opined that Mr. Cox would likely miss more than four days per

month, he would be off task more than 20% of the time, and would need more than four

unscheduled breaks.  (*Id*. at p. 3.)  As support for her opinions, LPPC Lemke explained in

narrative form that:

> Mr. [Cox] suffers from Generalized Anxiety D/O, Major Depressive D/O,
> Unspecified Depression D/O and Childhood Onset Fluency D/O (stuttering) as well
> as Personal History of Psychological Trauma related to his stuttering.  Mr. [Cox]
> was admitted to the Counseling Program at our agency in Jan. 2015.  I personally
> began working with him in 2016.  Despite all efforts to assist this there has been
> little to no progress pertaining to his anxiety and stuttering.  Although he would
> very much like to work his anxiety related to the stuttering [and] his history and
> ongoing psychological trauma related to stuttering, prevents him from working in
> my opinion.

(*Id*. at pp. 3-4.)

ii.     **State Agency Medical Consultants**

On June 19, 2019, state agency psychological consultant Robyn Murry-Hoffman, Ph.D. opined that Mr. Cox had mild limitations in his ability to understand, remember, or apply information and moderate limitations in his abilities to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 264, 274.)  She also opined that Mr. Cox had the mental RFC to perform one-to-four step tasks, work in a set routine with established standards per production and timeliness, have contact with customers if not more than one or two at a time, take feedback from a supervisor, have occasional contact with his supervisor, interact superficially with coworkers for work-related tasks, perform low-stress tasks, occasionally handle a change in established task standards if given additional time.  (Tr. 266-68, 276-78.)

On September 2, 2019, state agency psychological consultant Karla Delcour, Ph.D. reached the same conclusions as Dr. Murry-Hoffman on reconsideration, stating that a review of medical evidence did not change the initial mental RFC.  (Tr. 289, 291-93, 302, 304-06.)

C.     **Hearing Testimony**

1.     **Plaintiff's Testimony**

At his May 15, 2020 hearing, Mr. Cox testified in response to questioning by the ALJ and his representative.  (Tr. 58-70, 72-73.)  He testified that his parents passed away and he was living with his sister in their parents' house.  (Tr. 58.)  He had not been in a relationship for several years.  (Tr. 59.)  When asked what prevented him from working, Mr. Cox stated:

> Well, one thing is fear of stuttering.  It started in school when the abuse started in school.  And I just don't know how I got through it.  And then, I was hoping after school was out it would stop.  But it continued on, the abuse, at every job I was at. And I was beaten down so much that I just couldn't handle it anymore from all the abuse and comments.  And the speech problem and the fear of that problem just has taken over me and I can't handle it any longer.  And that is what interferes with a job and work.

11

(Tr. 61-62.)

Mr. Cox testified his therapy and counseling had been somewhat helpful.  (Tr. 62.)  It was helpful for him to talk to his therapists and "get it off [his] chest," but he did not feel it was entirely helpful because he still had the problem.  (*Id*.)  He stated he had problems with his speech even when alone, and usually kept to himself "because the anxiety over the speech problem [was] so bad that [he] found it better to keep by [himself]."  (Tr. 63.)  He had more anxiety when he was in a crowd or with someone he did not know, but he had anxiety even when around friends or family.  (Tr. 63-64.)  He defined a small crowd as more "than like two or three," stating it made him "very uncomfortable and anxious."  (Tr. 64.)

Mr. Cox had a driver's license and mostly drove to stores or to get something to eat.  (Tr. 59-60.)  He denied having problems remembering to perform self-care. (Tr. 63.)  He reported that he spent most days at home watching television, noting some problems following the story line if his anxiety was high.  (Tr. 64-65.)  He reported using his phone to order food so he could avoid calling to place the order.  (Tr. 65.)  He said that he used his phone for Facebook to keep up with family and a few friends.  (*Id*.)  He reported that his sister took care of things at home but he did his own laundry, mowed the lawn, and cleaned his own room.  (Tr. 65-66.)  He said that he could make change and count money.  (Tr. 65.)

Mr. Cox reported that Prozac "helped a tiny bit," and he had no medication side effects (Tr. 66, 67.)  Other than medication, he reported that keeping to himself and not interacting with others helped because he did not have to deal with the speech issue.  (Tr. 67.)  Sometimes his speech problems were worse than other times, but he could not say whether his speech problems had gotten better, worse, or stayed the same over the prior several years.  (Tr. 66.)  He felt his anxiety had "probably increased a tiny bit."  (*Id*.)  He explained:

> [I]t's just worrying about how I am going to say things and just worrying about this problem.  I mean, it just -- it takes its toll on me, about this stuttering problem. I keep on receiving comments from people often.  It takes its toll on you.

(Tr. 66-67.)   He reported having panic attacks three or four times per year, which caused him to have to instantly leave the situation.  (Tr. 68.)  He estimated having two or three days during the prior month where his speech issue and resulting anxiety were so bad that he did not leave his home.  (Tr. 68-69.)  On those really bad days, he lacked energy or motivation to do almost anything, but was able to keep up with his personal hygiene.  (Tr. 69.)  He sometimes had a hard time sleeping, especially if he had a bad day dealing with his speech issue.  (Tr. 68.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 70-78.)    She classified Mr. Cox's past work as a cashier/checker a light exertional, semi-skilled job performed at the medium exertional level.  (Tr. 73.)

For his first hypothetical, the ALJ asked the VE to assume an individual Mr. Cox's age and with his education and work experience who was:

> Limited to performing simple, routine, and repetitive tasks but not at a production rate pace, i.e., assembly line work.  Limited to simple work-related decisions in using his judgment and dealing with changes in the work setting.  Able to occasionally interact with supervisors and coworkers, never interact with the public.

(Tr. 74.)  The VE testified that the described individual could not perform Mr. Cox's past work but the individual could perform other work, including landscape laborer, commercial cleaner, and hand packager.  (Tr. 74-76.)

For this second hypothetical, the ALJ asked the VE to assume an individual as described in the first hypothetical but who was limited to no interaction with his coworkers.  (Tr. 76.)  The VE testified that:

> There will be, obviously, some sort of interaction with coworkers. So, a completely no interaction with coworkers does not exist. You know, there will always be some sort of small talk, like "Hi. How are you," that sort of thing. That is my opinion. He could, other than superficial contact, he could work as a hand packager . . . sweeper/cleaner . . . [and] kitchen helper.

(*Id*.)  The ALJ then asked the VE how her earlier responses would be impacted if the individuals described in the first and second hypothetical would be off task twenty percent of the time in addition to normal breaks and/or absent from work two days per month. (Tr. 77.)  In response, the VE explained that off task behavior over fifteen percent of the time was work preclusive and an employer's tolerance for absences after a probationary period was on average eight days a year. (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, 416.920.[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.      The Appeals Council's Decision

In its April 29, 2021 decision, the AC made the following findings:

1.      The claimant met the special earnings requirements of the Act on September 6, 2011, the date the claimant stated he became unable to work and met them through December 31, 2016.  (Tr. 6.)  The claimant has not engaged in substantial gainful activity since September 6, 2011.  (*Id*.)

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

2.    The claimant has the following severe impairments: depression, anxiety and speech impairment, but does not have an impairment or combination of impairments which is listed in, or which is medically equal to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

3.    The claimant's combination of impairments results in the following limitations on his ability to perform work-related activities: perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant was limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e., assembly line work); limited to simple work related decisions in using his judgment and dealing with changes in the work setting; and able to occasionally interact with supervisors and coworkers, but never interact with the public.  (*Id.*)

4.    The claimant's alleged symptoms are not consistent with and supported by the evidence of record for the reasons identified in the body of the ALJ's decision.  (*Id.*)

5.    The claimant was unable to perform past relevant work.  (*Id.*)

6.    The claimant was 44 years old, which is defined as a younger individual 18-49 as of the alleged onset date and was 52 years old as of the decision classified as closely approaching advanced age.  (*Id.*)

7.    The claimant had at least a high school education.  (*Id.*)

8.    Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that he can perform. (*Id.*)

Based on the foregoing, the AC determined that Mr. Cox had not been disabled as defined in the Social Security Act at any time from the alleged onset date of September 6, 2011 through June 2, 2020.  (*Id.*)

## V.    Plaintiff's Arguments

Mr. Cox raises three legal issues in his Brief:

1. The ALJ's decision should be reversed and remanded because the ALJ did not have the authority to hear and ultimately make a decision in this case.

2. The ALJ failed to properly account for the persuasive opinions provided by the state agency psychologists.

16

3. The ALJ failed to consider, evaluate, or even acknowledge the existence of a medical source statement, violating Social Security's regulations.

(ECF. Doc. 8 p. 2.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the decision, the Court may consider evidence not referenced by the decisionmaker.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406, *quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of

17

credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where the decision is supported by substantial evidence, the Sixth Circuit explains that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will not be upheld if the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ Decision was "Constitutionally Defective"**

Separate from his arguments on the merits, Mr. Cox contends that he is entitled to remand because the decisions of the ALJ and AC are "constitutionally defective." (ECF Doc. 8 p. 14.) He argues based on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, ⸺ U.S. ⸺, 140 S.Ct. 2183, 207 L.Ed.2d 494 (2020), that the statute under which the former SSA Commissioner was appointed violated separation of powers principles by allowing him to serve a longer term

18

than the President of the United States while protecting him from removal except for cause, similar to the statute found unconstitutional in *Seila Law*.  (*Id*. (challenging 42 U.S.C. § 902(a)(3)).)  Based on this precedent, Mr. Cox argues that the authority of the ALJ and AC to issue decisions in this case was "constitutionally defective" because their authority was delegated from the former SSA Commissioner, and that the decision was improperly based on regulations promulgated by the former SSA Commissioner without authority.  (*Id*. at pp. 14-15, ECF Doc. 11 pp. 3-7.)

The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause" (ECF Doc. 10 p. 7 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)), but argues that Mr. Cox is not entitled to relief because "even where an unconstitutional statutory removal restriction is present, a plaintiff cannot obtain retrospective relief without showing that the 'unconstitutional provision . . . inflict[ed] compensable harm.'" (*Id.* at p. 8 (quoting *Collins v. Yellen*, ⸺ U.S. ⸺, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).)  More specifically, the Commissioner argues Mr. Cox cannot show the removal restriction caused the denial of his benefits.  (*Id*. at pp. 8-12.)

Having considered the arguments of the parties and the applicable law, the undersigned agrees with numerous other courts that Mr. Cox's constitutional challenge to a statutory removal provision for the Commissioner of Social Security suffers from a fundamental deficiency in this individual Social Security disability appeal, namely that Mr. Cox lacks standing to assert the challenge.  *See Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d ---, 2021 WL 5882671, at

*10 (N.D. Ohio Dec. 13, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, No. 3:20-CV-05602-TLF, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No. 20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*, No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No. 21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

Standing is a threshold issue, and a failure to establish standing means a court cannot address the merits of a claim.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case.")  Mr. Cox asserts that "it is undisputed that the statutory provision at issue violated the Constitution, and that [he] has standing to raise a challenge on that basis." (ECF Doc. 11 p. 3.)  Although the Commissioner did not directly challenge Mr. Cox's standing in this case, this Court has the ability and the obligation to raise the issue of standing *sua sponte* where it is in doubt. *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised sua sponte."). Indeed, "[a]s a jurisdictional requirement, standing ... cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, ––– U.S. ––––, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019).  Moreover, it is noted that the primary defect challenged by the Commissioner – that Mr. Cox did not suffer actual harm caused by the statutory removal provision – is also a key element of the standing analysis discussed herein.  (ECF Doc. 10 pp. 7-12.)  *See also Rhouma*, 2021 WL 5882671, at *10 (raising standing *sua sponte* when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not established a 'nexus' between § 902(a)(3)'s

removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, Mr. Cox must satisfy a three-pronged test to establish Article III standing, namely: "[he] must show that [he] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))*; see also Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).

Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [he] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void."  141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779 (finding standing to challenge statutory removal protection for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 (("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and internal quotation marks omitted))).  However, the Court explicitly clarified that this "holding on standing does not mean that actions taken by such an officer are void ab initio and must be undone."  *Collins*, 141 S. Ct. at 1788, n. 24.

As the party invoking federal jurisdiction, Mr. Cox bears the burden of establishing standing for each claim and form of relief.  *See Loren*, 505 F.3d at 607 (citing *Lujan*, 504 U.S. at 561); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S. Ct. 1854, 1867, 164 L. Ed. 2d

589 (2006).  Given that standing cannot be waived or forfeited, the pertinent question is whether

the "traceability" requirement is met in this case.

In *Seila Law*, the Supreme Court considered traceability requirements for standing to

challenge a removal statute for the Director of the CFPB, concluding that the Director's issuance

of a civil investigative demand to produce documents and related petition to enforce that demand

resulted in a concrete injury traceable to the demand and petition.  *See Seila Law LLC*, 140 S. Ct.

at 2195–96.  The Court explained: "In the specific context of the President's removal power, we

have found it sufficient that the challenger 'sustain[s] injury' from an executive act that allegedly

exceeds the official's authority."  *Id.* at 2196.  This is consistent with the later holding in *Collins*

that standing to challenge a statutory removal provision for an executive officer may be

demonstrated by showing that a plaintiff "was harmed by an action that was taken by such an

officer and that the plaintiff alleges is void."  141 S. Ct. at 1788, n. 24.

In applying the *Seila Law* and *Collins* standards, the question becomes what act was

undertaken by the former SSA Commissioner that is alleged to have exceeded his authority and

caused injury to Mr. Cox.  Plaintiff does not identify any specific regulations promulgated by the

Commissioner that had any direct or specific impact on his claim.  Instead, he makes a broad

assertion that "the ALJ [and AC] decided this case under regulations promulgated by [the former

SSA Commissioner]" who "had no constitutional authority to issue those rules" when they were

promulgated, and that the ALJ and AC both lacked authority to hear and decide his case because

the former SSA Commissioner lacked the ability to delegate that authority to them.  (ECF Doc. 8

pp. 14-15, ECF Doc. 11 pp. 4-7.)

After reviewing the governing Supreme Court authority, the undersigned finds Mr. Cox's

argument to be unavailing because the finding he seeks is in direct conflict with the Supreme

Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S.Ct. at 2207-2211).  Although the relevant statute "unconstitutionally limited the President's authority to remove" the officer, the *Collins* Court explained the officer was "properly appointed" and "there was no constitutional defect in the statutorily prescribed method of appointment to that office."  *Id*. at 1787 (emphasis in original).  Accordingly, the Court found there was "no reason to regard any of the actions taken by the [agency] … as void."  *Id*.

In finding the agency actions were not voided by the unconstitutional removal provision, the Court explicitly distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," like the holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id*. at 1788 (citations omitted).  Thus, the Court distinguished the impact of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.  Based on the Supreme Court's explicit findings in *Collins*, the undersigned finds there is no legal basis to conclude that the actions of the former SSA Commissioner, the ALJ, or the AC in this case were automatically void or lacking in authority.

To demonstrate standing, Mr. Cox must show that an action by the former SSA Commissioner adversely affected him in a particularized and concrete way.  *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way.").  In *Collins*, the injury – a loss of net worth that impacted share values – was directly traceable to the FHFA Director's amendment of a formula to calculate dividends.  *See* 141 S. Ct. at 1779.  In *Seila Law*,

the injury – issuance of a civil investigative demand to produce documents, and court order granting a petition to enforce that demand – was directly traceable to actions by the Director of the CFPB.  *See* 140 S. Ct. at 2195-96.  In contrast, Mr. Cox has not pointed to any specific action of the former SSA Commissioner which he alleges impacted the adjudication of his claim or otherwise led to the denial of his benefits.

Consistent with the findings of other courts, the undersigned therefore concludes that Mr. Cox has failed to establish that he has suffered harm traceable to an unlawful action by the former Commissioner of Social Security, and has accordingly failed to establish standing to pursue this constitutional challenge.  *See, e.g., Rhouma*, 2021 WL 5882671, at * 11 ("Without a harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to challenge the constitutionality of § 902(a)(3)."); *Catherine J.S.W.*, 2021 WL 5276522, at *8 ("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner Saul, under *Collins v. Yellin*, 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments."); *Helms*, 2021 WL 5710096, at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.").

Because the undersigned concludes that Mr. Cox does not have standing to proceed with his separation of powers constitutional claim, the undersigned recommends that the Court deny Mr. Cox's request for a remand based on the asserted constitutional challenge.

**C.      Second Assignment of Error: Whether ALJ Erred in Finding State Agency
Psychological Consultant Opinions "Somewhat Persuasive" Without Including
Limitation to "Superficial" Interactions**

Mr. Cox argues that remand is required because the Commissioner found the state agency

psychological consultants' opinions "somewhat persuasive" but assessed a mental RFC that did

not include a limitation of superficial interaction and did not explain why the limitation was not

adopted.  (ECF Doc. 8 pp. 7-10, ECF Doc. 11 pp. 2-3.)  More specifically, Mr. Cox contends that

"the ALJ's limitation of occasional interaction with coworkers is not congruent with the state

agency psychologists' opinion regarding the need for only superficial interaction with

coworkers" (ECF Doc. 8 p. 9) and the ALJ did not sufficiently explain the reason for not

adopting a limitation of superficial interaction (ECF Doc. 8 pp. 9-10, ECF Doc. 11 pp. 2-3).

The Commissioner responds that the ALJ found the opinions only "somewhat

persuasive" and explained why the opinions were not adopted verbatim and adopted RFC

limitations consistent with and supported by the evidence.  (ECF Doc. 17 pp. 16-17.)  The

Commissioner also observes that the ALJ was not obligated to adopt the opined limitations

verbatim even if he had found the opinions persuasive.  (*Id*. at p. 17.)  Thus, the Commissioner

asserts that the issue "is not, as Plaintiff suggests, whether occasional interaction is an

appropriate substitute for a proposed limitation on superficial interaction; rather, it is whether the

ALJ reasonably evaluated the findings of the state agency consultants and explained why he

determined they were only somewhat persuasive."  (ECF Doc. 17 p. 17.)  Continuing, the

Commissioner argues that the ALJ's persuasiveness finding was explained and is supported by

substantial evidence.  (*Id*. at pp. 16-18.)

The psychological consultants opined that Mr. Cox had moderate limitations in his ability

to interact with others and "should work [with] occasional contact with his supervisor" and "can

interact superficially [with] coworkers for work-related tasks." (Tr. 264, 267.)  In comparison,

the RFC provided in relevant part that Mr. Cox was "able to occasionally interact with

supervisors and coworkers, but never interact with the public." (Tr. 5, 6, 39.)  The

Commissioner stated at Step Three that he found the opinions of the psychological consultants

"somewhat persuasive," explaining:

> Robyn Murry-Hoffman, Ph.D., evaluated the claimant's mental condition based on
> the evidence of record without examining the claimant on behalf of the DDD on
> June 19, 2019 (Exhibit 1A). Dr. Murry-Hoffman concluded that the claimant
> experiences mild limitations in his ability to understand, remember, or apply
> information, moderate limitations in his ability to interact with others, moderate
> limitations in his ability to concentrate, persist, or maintain pace, and moderate
> limitations in his ability to adapt or manage himself. This assessment was affirmed
> upon reconsideration (Exhibit 5A).
>
> The undersigned finds the opinions of the evaluating sources somewhat persuasive
> as they are somewhat consistent with the weight of the objective and subjective
> evidence of record. For example, . . .
>
> In interacting with others, the claimant has a moderate limitation. Treatment records
> generally document good eye contact, a stutter at times, but speech clear other
> times, and that the claimant was generally cooperative (Exhibits 1F and 2F at 12-
> 17). There were some reports of difficulty getting along with family and peers
> (Exhibit 2F at 5 and 7). The claimant also reported avoiding social interactions due
> to his stuttering (Exhibits 2F at 9, 14, and 16, and 7F at 6, 25, and 32). However,
> he does have friends and good relationships with some family (Exhibits 2F at 10,
> 7F at 12, and 8F at 6). The claimant alleged at the hearing that he isolates himself
> and cannot be around crowds. He also indicated that he will have to leave a place
> due to panic attacks, which he experiences 3-4 times a year.

(Tr. 38.)  Further, at Step Four the ALJ again explained that he found the opinions of the

psychological consultants "somewhat persuasive," stating:

> Dr. Murry-Hoffman concluded that the claimant is capable of 1-4 step tasks and
> can work in a set routine with established standards per production and timeliness
> (Exhibit 1A). He is also capable of contact with customers if no more than one or
> two at a time. He is capable of taking feedback from a supervisor, but is limited to
> occasional contact with his supervisor. He can interact superficially with coworkers
> for work-related tasks. Dr. Murry-Hoffman also concluded that the claimant is
> capable of low stress tasks and can handle occasional changes if given extended
> time. This assessment was affirmed upon reconsideration (Exhibit 5A).

> The undersigned finds the opinions of the evaluating sources somewhat persuasive as they are somewhat consistent with the weight of the objective evidence of record. The mental residual functional capacity is also provided in more vocationally relevant terminology. For example, . . . [d]ue to moderate limitations in his ability to interact with others, the claimant is limited to occasional interaction with supervisors and coworkers, but no interaction with the public. . .

(Tr. 41.)  Having explained that he found the opinions "somewhat consistent with the weight of the objective evidence of record," but providing a mental RFC that was stated in "more vocationally relevant terminology" (Tr. 41), the ALJ adopted a social interaction limitation of "able to occasionally interact with supervisors and coworkers, but never interact with the public" (Tr. 39).  The ALJ did not incorporate verbatim the state agency consultants' stated limitation to "interact superficially [with] coworkers for work-related tasks."  (Tr. 267.)

Mr. Cox asserts that: "On its face, the ALJ appeared to have properly considered the state agency psychologists' opinions, and properly explained how those opinions translated into more vocationally relevant terms" but "[a] closer look will reveal that the ALJ did not account for all of the state agency psychologists' opinions."  (ECF Doc. 8 p. 8.)  As a general matter, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see also Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) ("[A]n ALJ is not required to use 'the exact language of [the medical] professionals' when incorporating limitations in the RFC.") (quoting *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436 (6th Cir. 2014)), *report and recommendation adopted*, No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019).  Even where an opinion is given great weight, the Sixth Circuit has noted "there is no requirement that an ALJ adopt a state agency psychologist's opinion[] verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations

27

wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, No. 1:13-CV-00395, 2013 WL 6283681, at *7–8 (N.D. Ohio Dec. 4, 2013) (finding ALJ who gave great weight to an opinion was not required to incorporate all limitations from that opinion).

The Sixth Circuit's decision *Reeves* is of particular relevance here, as the court in that case specifically considered a situation where the state agency psychological consultants had found the plaintiff was "able to relate to a few familiar others on a <u>superficial</u> basis," and then concluded that the ALJ's RFC limitation to "only <u>occasional</u> interaction with the public" was "not inconsistent with either of the state agency psychologists' opinions" and was supported by substantial evidence. *Reeves*, 618 F. App'x at 275. The *Reeves* court noted that its findings were appropriate even though the opinions had been given "great weight." *Id.* Mr. Cox recognizes this very proposition by his acknowledgement that "the ALJ was not bound to their opinions in any way." (ECF Doc. 8 p. 10.) He nevertheless argues that "the ALJ's mental residual functional capacity is not more vocationally relevant, as the ALJ claimed, it is materially different" because the term "'occasional' specifically refers to the quantity of interaction one can sustain" and "'[c]ourts routinely recognize that limiting the *quantity* of time spent with an individual does not accommodate a limitation relating to the *quality* of the interactions—including a limitation to 'superficial' interaction.'" (*Id*. at p. 9 (quoting *Hummel v. Comm'r of Soc. Sec.*, Case. No. 2:18-cv-28 (S.D. Ohio, Mar. 13, 2020) and citing unpublished district court cases).) For the reasons stated below, the undersigned does not find Mr. Cox's arguments convincing within the framework of this case.

It is true that Social Security Ruling 96-8p generally requires ALJs to consider all medical opinions in the RFC assessment and, if that assessment "conflicts with an opinion from a

medical source," "explain why the opinion was not adopted."  SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *7 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).  In this case, the ALJ did not suggest that a limitation to superficial interactions would "conflict" with a limitation to occasional interactions.  As a matter of logic, there is a clear potential overlap between the two terms, which is consistent with the Sixth Circuit's holding in *Reeves* that a limitation to "occasional" interactions was "not inconsistent" with opinions calling for "superficial" interactions.  *Reeves*, 618 F. App'x at 275. Without mentioning a conflict, the ALJ did explain that his modifications were intended to provide a mental RFC containing "more vocationally relevant terminology."  (Tr. 41.)

Converting limitations "into vocationally relevant terms," can be a necessary tool before an ALJ poses a hypothetical limitation to a vocational expert.  *See Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) (finding ALJ "reasonably converted and incorporated" medical opinions given great weight "into vocationally relevant terms in Plaintiff's RFC"), *report and recommendation adopted*, No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019).  This is because SSA guidance states that VE testimony "generally should be consistent with the occupational information supplied by the DOT."  SSR 00-4p, *Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, 2000 WL 1898704, *2 (Dec. 4, 2000)*.  Indeed, the Commissioner's internal manual instructs ALJs "not [to] permit the VE to respond to questions on medical matters or to draw conclusions not within the VE's area of expertise."  HALLEX I-2-6-74(C); *see also Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008) (finding HALLEX is "not binding on this court" but is persuasive authority).  Where a VE has based testimony "on an assumption," the manual requires ALJs to "ask the VE to clearly describe the

29

assumption on the record." *Id.* Further, Social Security Ruling 00-4p provides that an ALJ may not rely on VE testimony that "is based on underlying assumptions or definitions that are inconsistent with [SSA's] regulatory policies or definitions." SSR 00-4p, 2000 WL 1898704, *3.

In the context of this guidance, it is clear that VE testimony must be based on either the VE's own vocational expertise or information specifically set forth in the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO"). Conversely, VE testimony should <u>not</u> be based on conclusions outside the VE's expertise, assumptions not clearly described on the record, or assumptions or definitions that are inconsistent with the SSA's policies or definitions. This is the framework in which the Court must consider the ALJ's restatement of social limitations found to be "somewhat persuasive" into "vocationally relevant terminology," especially where the term that is the focus of Mr. Cox's arguments in this case – "superficial" – is not a "vocationally relevant" or defined term in the DOT or SCO.

By way of contrast, the DOT and SCO do have specific defined terms for frequency, defining "occasional" activities and conditions as those existing up to 1/3 of the time. *See Beasley v. Berryhill*, No. 5:16-CV-00108-LLK, 2017 WL 2543814, at *2 (W.D. Ky. June 12, 2017) (explaining that "[t]he terms 'occasional' and 'frequent' are terms of art in Social Security law [and] '[o]ccasional' means occurring from very little up to 1/3 of the time") (citing Social Security Ruling (SSR) 83-10, 1983 WL 31251); DICOT 979.687-034, Appendix C, 1991 WL 688702 (2016); SCODICOT Appendix C & D. The fact that "occasional" is a defined term is acknowledged by Mr. Cox. (ECF Doc. 8 p. 9.) Other defined terms relating to social interactions include: mentoring, negotiating, instructing, supervising, diverting, persuading, speaking-signaling, serving, and taking instructions-helping. *See* SCODICOT Appendix E; *see also Reese v. Saul,* No. 3:18-CV-442-HBG, 2020 WL 1312703, at *14 (E.D. Tenn. Mar. 19,

30

2020) (explaining that "the 'DOT ranks the degree of interaction with people in each job type' on a scale from 0 (Mentoring) to 8 (Taking Instructions-Helping), going from the highest to the lowest level of functioning") (quoting *Kane v. Saul*, No. 3:18-CV-746 (HEH), 2019 WL 7562760, at *15 (E.D. Va. Aug. 20, 2019), *report and recommendation adopted by*, 2020 WL 130134 (E.D. Va. Jan. 10, 2020)).

Not only was the ALJ not obligated to adopt the opinions verbatim, the ALJ appropriately provided a mental RFC that was stated in "more vocationally relevant terminology." (Tr. 41.) Mr. Cox contends, however, that "the ALJ's attempts to reshape or translate the state agency psychologists' opinion of 'superficial' interaction should not stand as a defense of the ALJ's decision." (ECF Doc. 8 p. 9.) In support, he cites the unpublished district case of *Slone v. Comm'r of Soc. Sec.*, No. 2:20-CV-4850, 2021 WL 4901498, at *4 (S.D. Ohio Oct. 21, 2021), *report and recommendation adopted*, No. 2:20-CV-4850, 2021 WL 5323115 (S.D. Ohio Nov. 16, 2021). In *Slone*, the ALJ found the state agency consultants' opinions which limited the claimant to "superficial interactions with supervisors, coworkers and the general public" to be "'consistent with and supported by the medical evidence of record'" and therefore "persuasive" but did not incorporate the superficial interaction limitation into the RFC. *Id*. The ALJ only included a limitation to occasional interaction, explaining that "the use of the term 'superficial' was 're-phrased in more vocationally relevant terms." *Id.* The court found this explanation "inadequate" on the basis that "[c]ourts routinely recognize that limiting the *quantity* of time spent with an individual does not accommodate a limitation relating to the *quality* of the interactions–including a limitation to 'superficial' interaction." *Id*. (emphasis in original). The unpublished decision in *Slone* is not binding. Moreover, the undersigned finds the case distinguishable and not persuasive for the reasons explained below.

31

Unlike in *Slone*, the ALJ here did not find the opinions "persuasive."  As explained above, he found them only "somewhat persuasive" as they were "somewhat consistent with the weight of the objective and subjective evidence."  (Tr. 38, *see also* Tr. 41.)   The ALJ specifically stated and supported his reasoning for finding the opinions "somewhat persuasive." (*Id*.)  The ALJ also discussed Mr. Cox's allegations regarding his ability to interact with others, stating that:

> The claimant reported some difficulty getting along with family and peers and obsessive thoughts (Exhibit 2F at 5 and 7). The claimant also continued to report social isolation due to his stutter (Exhibit 7F at 6). However, he acknowledged some benefit from counseling and he was in contact with his family (Exhibit 7F at 7). Objective findings remained unchanged with good eye contact, linear and goal-directed thought process, and good insight and judgment (Exhibit 7F). He was also cooperative, but he was somewhat anxious. At times, the claimant stuttered, but his speech was clear at other times.

(Tr. 40.)  The ALJ's reasoning for finding the opinions "somewhat persuasive" is not unexplained, and Mr. Cox has not argued or shown that the ALJ's finding persuasiveness finding is unsupported by substantial evidence.

Additionally, the *Slone* decision is premised on a determination that "'superficial interaction' is a well-recognized, work-related limitation."  *Slone*, 2021 WL 4901498, at *4.  The undersigned finds to the contrary.  "Occasional" as discussed above is a defined term within the DOT and SCO, but "superficial" is not.  It is also notable that dictionary definitions do not provide further clarity as to what work-related interactions are intended to be included or excluded by a limitation to "superficial" interactions.  *See, e.g.,* "Superficial." *Merriam-Webster's Unabridged Dictionary, Merriam-Webster*, https://unabridged.merriam-webster.com/unabridged/superficial. Accessed 11 Jan. 2022 ("not penetrating beneath or farther than the easily or quickly apprehended features of a thing: concerned only with the obvious or apparent"; "lacking in depth or substantial qualities: not profound"; "presenting only an

appearance or a semblance: not far-reaching, significant, or genuine").  Given the lack of a

defined meaning for the term "superficial," it is not clear from the record what specific manner

of communications the psychological consultants intended to permit or exclude when they

opined that Mr. Cox could "interact superficially" with coworkers.

In light of the foregoing findings and authority – specifically, that the Sixth Circuit has

upheld the adoption of a similar RFC in similar circumstances, that the term "superficial" does

not have a defined meaning for purposes of vocational testimony, that the ALJ clearly indicated

that he was stating the RFC in vocationally relevant terminology, that the underlying medical

opinions were found to be only "somewhat persuasive," and that the ALJ clearly explained and

supported that finding with substantial evidence  – the undersigned finds that Mr. Cox has not

demonstrated that the ALJ erred in failing to adopt the term "superficial" as a part of the mental

RFC limitations applied in the case.

**D.      Third Assignment of Error: Whether ALJ's Failure to Address Medical Opinion
          Requires Remand if AC Considered Opinion Before Adopting ALJ's Findings**

Mr. Cox argues that remand is required because the ALJ failed to evaluate the opinion of

LPCC Lemke.  (ECF Doc. 8 pp. 11-13.)  While he acknowledges that the AC did evaluate LPCC

Lemke's opinion in its subsequent decision, he argues the AC's "post hoc rationalization should

be disregarded" because "[i]t was the ALJ's duty to consider and evaluate the opinion evidence,

not the [AC]."  (*Id.* at p. 13.)  He contends that it was improper for the AC to seek to "remedy the

ALJ's failure by substituting their own reasoning for that of the ALJ," and that the AC "cannot

now, for the first time, consider this evidence and properly determine its persuasiveness."  (*Id.*)

The Commissioner responds that the AC "properly adopted the ALJ's decision, evaluated the

additional opinion evidence the ALJ failed to consider, and issued the Commissioner's final

decision," which became "the final decision appealable to this Court."  (ECF Doc. 10 p. 18.)

33

Contrary to Mr. Cox's argument, the regulations do empower the AC to "*either* issue a decision *or* remand the case to an administrative law judge" when reviewing an ALJ decision. 20 C.F.R. § 404.967 (emphasis added).  And because the Commissioner has "delegated to the Appeals Council [her] 'duties, powers and functions relating to the holding of hearings' under the [Social Security] Act, it is well settled that final action by the Appeals Council becomes … the final determination of the [Commissioner] for purposes of judicial review under … 42 U.S.C. § 405(g)."  *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir.1986) (en banc) (citations omitted). Indeed, where the AC has issued a decision that conflicts with the underlying ALJ decision, the Sixth Circuit recognizes that "the question before us is whether substantial evidence supports the Appeals Council's decision."  *Johnson v. Sec'y of Health & Hum. Servs.*, 948 F.2d 989, 992 (6th Cir. 1991) (citing *Mullen*, 800 F.2d at 546); *Taylor v. Comm'r of Soc. Sec.*, 91 F.3d 144 (Table), 1996 WL 400175, *4 (6th Cir. 1996) (quoting *Johnson*, 948 F.2d at 992).

Here, although the ALJ did not discuss LPCC Lemke's opinion in his decision (Tr. 40-41), it is undisputed that the AC granted Mr. Cox's request to review that decision, considered the opinion in the first instance and found it to be "less persuasive," adopted the ALJ's findings at all steps of the sequential process, and issued a final unfavorable decision.  (Tr. 5.)  More specifically, the AC discussed LPCC Lemke's opinion follows:

> [LPCC Lemke] opined the claimant was not able to understand and remember short and detailed instructions, maintain concentration and persistence, interact with others, or adapt in the workplace on a regular, reliable, sustained basis. Additionally, the source indicated the claimant would be off task over 20% of the workday and would need breaks more than four times a day. The Appeals Council finds the opinion less persuasive. The opinion is consistent with the opinions from Tim Hicks, LPPC in Exhibits 9F and 10F, which the Administrative Law Judge considered and noted were based on the claimant[']s subjective complaints and thus weren't persuasive. The treatment notes from Ms. Lemke show the claimant was experiencing anxiety, but they do not appear to show the extreme limitations that are discussed in the opinion provided (Exhibits 2F, 7F). Specifically, the mental status examination findings consistently found the claimant alert, with good eye

contact, cooperative behavior, and linear and goal directed though process (Exhibit 2F pages 12, 14, 16; Exhibit 7F page 7). Additionally, the residual functional capacity and paragph [sic] B findings in the decision are supported by the state agency Medical consultants at both the initial and reconsideration levels as addressed by the Administrative Law Judge in the decision (Exhibits 1A, 5A).

As such, the evidence provides no basis to change the Administrative Law Judge's decision. Therefore, the Appeals Council adopts the Administrative Law Judge's findings and conclusions regarding whether claimant is disabled.

(Tr. 5.)  From this analysis, it is clear that the AC considered the opinion of LPCC Lemke and clearly articulated its grounds for finding that opinion to be "less persuasive."

Since the AC was within its authority to analyze LPCC Lemke's opinion in the first instance and issue a final decision in the case, Mr. Cox's argument that the AC's analysis of LPCC's Lemke's opinion should be disregarded as a "*post hoc* rationalization" is not well taken. *See, e.g., Pursley v. Comm'r of Soc. Sec.*, No. 1:18-CV-256, 2019 WL 2537291, at *5 (S.D. Ohio June 20, 2019) (finding "it is the decision of the Appeals Council, and not that of the ALJ, that represents the final decision of the Commissioner" where AC accepted review of case to correct ALJ error in failing to discuss medical opinion), *report and recommendation adopted,* No. 1:18-CV-256, 2019 WL 3430842 (S.D. Ohio July 30, 2019); *Gay v. Comm'r of Soc. Sec. Admin.,* No. 1:20-CV-180, 2021 WL 855120, at *3 n. 3 (N.D. Ohio Mar. 8, 2021) (finding no support for argument "that the ALJ's failure to even mention [an] opinion, regardless of the Appeals Council's separate consideration of the opinion, constituted error") (citing *Pursley*, 2019 WL 2537291, at *5).

Mr. Cox argues in the alternative that the AC's analysis of LPCC Lemke's opinion was "improper and inconsistent with the regulations" and based on "an incorrect legal standard." (ECF Doc. 8 p. 13.)  In so arguing, he focuses on the AC's observation that "[t]he opinion is consistent with the opinions from Tim Hicks, LPPC…, which the Administrative Law Judge

considered and noted were based on the claimants subjective complaints and thus weren't persuasive" (Tr. 42), and appears to suggest the AC's analysis was improperly limited to that single factor.  (ECF Doc. 8 p. 13.)  But a review of the above discussion clearly reveals that the AC also considered the supportability and consistency of LPCC Lemke's opinion in comparison to the medical records and the opinions of the state agency psychological consultants.  (Tr. 5.)

There is similarly no merit to Mr. Cox's argument that the AC "did not even do their own review of the entire record" and "essentially adopted the rest of the ALJ's decision."  (ECF Doc. 8 p. 13.)  The undersigned can see no basis in the record to conclude that the AC issued its decision without considering the record, and there is nothing improper in the AC determining based on its own review of the record – including LPCC Lemke's opinion – that it concurred with ALJ's overall findings in the case.  The Sixth Circuit addressed a similar situation in *Taylor v. Commissioner of Social Security*, where it observed:

> [I]n this case, the decision on review is the decision of the Appeals Council since the Appeals Council granted review of the ALJ's decision and the decision of the Appeals Council is the final decision of the Commissioner. However, although the Appeals Council granted review of the ALJ's decision, the Appeals Council's decision is the same as the ALJ's decision in all essential respects and the Appeals Council's decision relies on and adopts the ALJ's findings in many instances. Therefore, where the Appeals Council adopted or relied on the findings of the ALJ concerning an issue[], the appeal of that issue involves the findings of both the ALJ and the Appeals Council, and the substantial evidence standard of review applies … to the findings regardless of whether they were made by the Appeals Council, the ALJ, or were made by the Appeals Council in reliance on the ALJ's findings.

*Taylor*, 91 F.3d 144, 1996 WL 400175, * 4 n. 2.  In this case, the ALJ's underlying findings were adopted by the AC, and appropriately made up the majority of the findings in support of the Commissioner's final decision.  Mr. Cox has failed to demonstrate that it was improper for the AC to adopt the ALJ's findings and reach the same ultimate determination after completing its independent and additional review of LPCC Lemke's opinion.

For the reasons stated above, the undersigned finds that the ALJ's failure to consider the opinion of LPCC Lemke in the first instance is not a basis for remand because the AC accepted review of the ALJ's decision and considered LPCC Lemke's opinion before adopting the ALJ's findings and issuing the final decision of the Commissioner.  Mr. Cox has not met his burden to demonstrate that the AC's analysis of LPCC Lemke's opinion was procedurally improper or lacked the support of substantial evidence.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

July 29, 2022                               */s/ Amanda M. Knapp*
                                    AMANDA M. KNAPP
                                    UNITED STATES MAGISTRATE JUDGE

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).